23-7961 Whitney v. Montefiore Medical Center Ms. Hunt Dr. Ryan Whitney Ms. Hunt Ms. Hunt Ms. Hunt The word snap is doing important work there, right? Because if in fact because of the disability he can't perform the job functions, even with an accommodation, it would be legitimate to terminate him, right? It is a reasonable accommodation that's required by the ADA not keeping somebody in place. Correct. If he could not perform the essential functions even with the reasonable accommodation, which we think that's not the case because we also have our failure to accommodate claim, then the hospital doesn't have to keep him. Agreed. But the snap judgment I think is important here because we know four months in, four months not even 10% or roughly 10% of a three-year program. The second the residency program director learns of his ADHD, she urges him over and over again to find another specialty. She hopes he's going to leave that way. As he explained it to the ad hoc committee later, it was disheartening to report his ADHD and be told some people just aren't cut out for anesthesia. Is that, go look for somewhere else, the best evidence that you think is the genuine dispute over retaliatory intent? What do you think is the best evidence suggesting a genuine dispute? Yes, Your Honor. So we'd start with that and that's at JA 942, which is like the recap email of that conversation and JA 1254, which is when he described it to the ad hoc committee. We would add that she lied about it, or a jury could find that she lied, and that's at JA 1852. And the district court, in fact, acknowledged that a jury could find the lie, but gave it no, you know, no credit. So basically said it's immaterial, this is a minor fact. We think that's not the case because if she lies about it, and her and her deputy, because he also told her deputy, and he also lied. Can I ask you about what they do proffer and why the district court erred in finding that this compelled a judgment for the hospital? I gather there's no question about violating the moonlighting policy, is that right? You're right, Your Honor. There's no dispute about that, but the hospital suspended the termination anyway. I'm sorry, I'm not following. I'm sorry, the hospital, even when the hospital knew of moonlighting, they decided to suspend Whitney's termination. So that suggests it's not. She's violating, she's violating a policy on moonlighting. He's violating a policy on moonlighting, right? We don't dispute that, Your Honor. Okay. But what we do dispute. There's also no dispute that failed the basic exam three times, right? There's no dispute about that, Your Honor. On both of those, moonlighting and the basic exam, we do dispute that those are sufficient reasons for termination. Well, let me make sure I understand a few things, and then I want to hear you as to why they can't terminate her. There is a 44% discrepancy rate in the handling of controlled substances. That's not disputed, right? What's disputed is that that's out of the ordinary, and also it's not disputed that that audit produced a 44%. I don't want to get ahead of Your Honor's questions. I have a response on that as well. But anyway, let me ask you, is it your position that those three grounds do not provide a nondiscriminatory reason for the termination of an anesthesiologist? Because then we can get into the specific case instances. But moonlighting when you're not supposed to, failing an exam three times, and having a problem, a documented problem with respect to the handling of controlled substances, you don't think that that provides a nondiscriminatory reason for termination? Your Honor, we think they are nondiscriminatory reasons, but they are not sufficient reasons for termination on the evidence of the hospital's own policies. We of course don't second-guess the hospital's judgment. Now you have to show to us that these are not the real reasons. Yes, Your Honor. And I find that kind of difficult to accept. I mean, I'm not sure many people told that this was the doctor's record, would want the person as their anesthesiologist. And that's before we get into the changing the record on the possible wet tap. What's your response to that, changing the hospital record? Okay, so there's a fact dispute about what actually happened, but setting that aside, the hospital decided to give Whitney a warning, a written warning for that. He changed the record, right? He changed the record without speaking to the attending physician. He added a note under his own name without speaking to the attending physician. That's what a jury could find. That's his testimony as to what he did. The charge read wet tap, and he changed it to mitigate it to possible wet tap without speaking to the attending physician, which was what he was supposed to do before changing a hospital record. Is that right? Your Honor, a jury could certainly find that, but a jury could also credit his testimony. Is that the hospital policy, that someone in Whitney's position would speak to the attending before changing a hospital record? That is certainly what Ramachandran represented to Dr. Whitney when she issued him a written warning for that incident and said, only, you will be terminated only if it happens again. No, but that's not all that happened. That's why I'm going through the first three documented things. It's just difficult for me to understand how what you think overcomes all this to allow a reasonable jury to find, oh no, that's not the reason that the doctor was terminated. It's because they discriminated against him. Okay, so for the wet tap and the drug discrepancies, I would take you to the April termination action at JA 933. And I would start from the hospital gave neither of those as reasons for the termination. So neither of those items is listed in the termination letter. The basic exam fail is listed in the termination letter, but what is specified is that his training would be, a result of that exam failure would mean his training was extended for six months, not that he would be terminated. And the part that I'm confused about is I was surprised to hear your answer to Judge Radji. I thought you would say that the discrepancy and the failure of the exam was related to his disability and that the accommodation was having a policy that was different for someone that had his disability, but you didn't say that. So that's not your position. So the basic exam fail was related to his disability. The first time he took the exam with accommodations, he passed. However, the grantor of the accommodations in that instant is the Board of Anesthesiology. So we're not saying the hospital was required to give him accommodations on the exam. However, you are right about the, you know, we are saying that these types of things, that people without disabilities were treated differently, not on the basic exam fail, but vis-a-vis charting errors and discrepancies with drugs, that was also an issue with Doe. And, of course, he was allowed extra time and allowed to graduate. But I do want to go back to, I mean, the reason why I don't think, I'll say one other thing about the drug discrepancies. There was an audit in the time period, you know, in his accommodation time period from January to April 2021, and his discrepancy rate was 8%. Dr. Ramachandran requested that audit. When asked at the grievance hearing whether or not there was an updated audit, she concealed it from them. She said no. That's just one of several places where the jury could find that she lied in an effort to shape the record to be less favorable to Whitney and more negative. But how does that support a claim that the real reason was disability discrimination? Well, we would go back to, I mean, so we go back to, I think there's a story here that the jury could find. Based on four months in, the second she learns of his diagnosis, she tells him, you better find another job. Then there's a consistence, you know, throughout, even when he's meeting milestones. The disability is attention deficit disorder, right? Yes, Your Honor. And this is an anesthesiologist. Yes, Your Honor. So what accommodation was she seeking to compensate for her deficit? So Dr. Whitney did not request accommodations until the fall of 2020, the beginning of his third year. But I want to say, leading up to that, his first year, he passed. The end of his first year, they said positive evaluations. He did a good job on the neural rotation. He was well prepared. Everyone agrees? That's picking that out. I mean, you know, we could go through other evaluations and the problems. Yes, Your Honor. Is it your client's position that she would have always required an attending in order to do, in order to be an anesthesiologist in a surgery? I mean, the complaints are that she wasn't focused during, I mean, maybe her deficit is the reason for this. But how is she going to be, perform anesthesiological work? I mean, what kind of accommodation are you going to give her? Okay, I'm going to get to the accommodations. I just want to mark that it's at the time of his first termination that Whitney had been promoted to a third-year resident. Like, there is, immediately before his first termination, there's an evaluation that says he's exactly where he's supposed to be. So this idea, yes, he had some struggles. He was remediated. He worked through it. He's meeting what he's supposed to do at the time he's first terminated. I'm not sure I understand when you say he worked through it. I'm saying they gave him a one-month remediation period, and at the end of that he had improved. Where he was supervised closely through all of that, and there were problems. I mean, there was the three-month-old who had the breathing tube dislodged during a cleft palate surgery, and the doctor's observation is that there was a failure to perform one of the primary functions of an anesthesiologist. Your Honor, the attending anesthesiologist who was his supervisory anesthesiologist gave him an evaluation that said, you know, he met the standards of a third-year resident that day. Now, that anesthesiologist later has a- Because he's supervised. Now, though- No, no, no. Can he perform the functions of an anesthesiologist without supervision, given his deficit? Yes, Your Honor, and we think the record shows that. I thought your answer was going to be that your adversary didn't seek summary judgment on the first three elements, including whether or not they could perform essential judgment, right? That's your Honor. Yes, Your Honor. The qualified element is not disputed at this stage. We're at causation, although I take Judge Radji's questions to also go to sort of overall pretext, and I think it's important to establish that a jury could find that as of the time of his initial termination, he was meeting all of his milestones of what was expected of him then, which is as a second-year resident, and he was kept. After that very initial remediation period, he was double-covered like every other resident, and he was kept on call all the way to the very end. But there's a couple of concerns, right? I mean, if your theory is that Ramachandran was manipulating the whole thing since she found out about him, she denies that she learned about the diagnosis in 2018, but you say she learned in 2018, and then she's manipulating the whole thing out of animus, and all of the decision-makers are controlled by her efforts. The fact that, you know, there's negative reviews, and then he goes on remediation, then they pass him, then there's another evaluation, then he's terminated, and then they suspend the termination, doesn't it suggest that she was not actually in control of the whole evaluation process? Well, so, Your Honor, we don't say that she was in control of the entire evaluation process. But what we do say is there is a steady stream, and it starts as soon as his first fall of texts between her and her deputy, evincing her desire to pay for a trail to get him out of the program. They're happy when they get something, quote-unquote, concrete against him. They're trying to prove their case. They're documenting the record. But what is the truth in the fact that there is this whole effort to sort out whether it is a performance issue or whether it is due to his disability and whether he can perform during his accommodations? If she thinks it's actually not due to his disability and he just can't perform the job, and she's saying, but we have to document that because that's the standard, doesn't that show that actually the employer did not just have it in for him because of disability? They had to document whether it was because of disability or performance. So I think the problem here is that what we come to is when she's using the word document, it's a specific kind of thing, and that is amplifying negative feedback. So she did three things. One, she set him up to fail. Two, she skewed the evaluation process. There's no dispute that he was subject to an evaluation process in his third year that no other third-year resident. So you're arguing pretext. You're not arguing that McDonnell Douglas doesn't apply because you have direct evidence of discrimination. Is that correct? Look, I thought your stronger argument was that ADHD will make you not be able to perform on the basic exam or ADHD will make you not be able to keep track of drugs, and, therefore, that is direct evidence, and we're not in McDonnell Douglas' land of having to go back and forth, but it seems like you are conceding that we are in McDonnell Douglas' land. And if that's the case, then we just need to figure out whether or not these are legitimate reasons, right? Your Honor, certainly if you believe the evidence rises to a level of direct evidence, we wouldn't dispute that. In our view, this court has described that kind of direct evidence like the evidence in Porter, which is a disability case, as specifically saying, you know, I don't like them because of their disability, and so we didn't have those kind of comments, but we do have evidence of bias in the form of that immediate judgment that he's not going to be able to succeed. But then now you're back to arguing with the first question, and it's like, is the standard stereotyping or is the standard believing that the disability is the but-for, is the standard of the disability being the but-for cause of the adverse action or is the standard having to prove, you know, I don't like people with X, Y, or Z because, I mean, it's different. And I thought that our precedent in this case was we don't have to prove what was in their heart about how they feel toward ADHD, people that have ADHD. We just need to figure out whether or not they took an adverse action because the person does have ADHD. So I think there's two different answers depending on the claims. On the failure to accommodate claim, if they do not reasonably accommodate, and we think a reasonable jury could find they didn't, then firing for- Did you say what the reasonable accommodation would be? Did you put in evidence as to what the reasonable accommodation was? Yes, Your Honor. We put in evidence of what we requested when they agreed to what they did. Right, but there's no requirement that they have to give you everything in order for it to be reasonable, right? So, like, I thought you were going to make a failure of interaction claim, and you didn't make that either. Your Honor, you're right. We didn't bring an interactive process claim, but what we did bring is this type of claim that was at issue in Porter where the employer agrees to accommodations, and as we cited a First Circuit case, once they've agreed, they have to reasonably implement them. They don't have to be perfect, but they cannot implement the accommodations in a way that makes them ineffective. What accommodation did he seek for performing in the operating room? So there's three that were particularly important that they didn't meet. One was protected breaks, right? So it's kind of a protected breaks, break time to collect thoughts in between OR cases or at lunch. Two was assigning a mentor that was mutually agreed, and three was giving him this particular kind of feedback, but not subjecting him, but in a way that was designed to distribute learning information on his ADHD learning style, giving him this feedback in context, not what it turned out to be, which was the sui generis. Did you offer any evidence that medical professionals were of the view that someone with those accommodations and ADHD could nevertheless perform in the operating room? Yes, Your Honor, we did. There's a case study out of Mass General, and I don't have the exhibit number for you right now, but we did offer that as evidence that those accommodations would be. And again, the hospital agreed that those accommodations were both reasonable and would be effective, but then they didn't deliver on them. I mean, your basis for saying that the hospital agreed to it is this November 11, 2020 letter, right? Not just that, Your Honor. Also, Ramachandran's testimony, when she was asked what the hospital did to implement those accommodations, she agreed. She defended doing things or not doing things. She never said they didn't agree to them. And once again, they didn't seek summary judgment on the first three. So they didn't seek summary judgment on whether or not they could have performed the job with a reasonable accommodation. So at the very least, whether or not they would have had it viable, he couldn't have accomplished it anyway. That's not where we are, right? That's correct, Your Honor. Those elements are not in dispute. The only element in dispute is whether or not they fairly reasonably accommodated. Yeah, but your measure of the reasonable accommodation is what they agreed to, right? As I read the November 11 letter, it lists in boldface the requests that he makes, but then it says below each request how they're going to implement it. And it's not always exactly the same as the specific request. So like it says, having a designated mentor and contact person mutually agreed on by the resident. But then it says, okay, that's your request. But then it says the department will assign Mr. Whitney a designated contact person regardless of rotation and assign him a designated mentor for each rotation. It's not – from this letter, I would not assume that there is a kind of review process by which he has to agree to the mentor. They're just saying that's the way they're going to implement it. And on the breaks, they say, okay, we'll honor the breaks, but you have to work it out with your supervisor or the attending. And that's his claim is that having worked it out with the attending, it wasn't exactly the way he wanted it to be. And so it just doesn't seem to me like what they did is inconsistent with how they announced that they were going to implement the accommodations. So taking the letter first, at JA 969 it says we agree to everything but one. So that at the least creates ambiguity on the face of the letter. But separately we have Ramachandran's testimony when asked about the specific things that are in dispute, about whether they agreed to it. At 1886 and 1888, she starts talking about defending what they did or didn't do. She never says we didn't agree to those things. The question I have that's related – I'm sorry, did I – Well, I mean you're saying it says the department has carefully reviewed the accommodations requested and made decisions as to the accommodations that can incorporate into Mr. Whitney's – Dr. Whitney's rotations. It's prepared to meet the request of accommodations except one as set forth below. And then so there's a description of how they're going to accommodate each of the requests. It doesn't seem ambiguous to me that they would have agreed to it exactly as he articulated it as opposed to have a set forth below in the letter they were going to implement it. Well, Your Honor, TOFOLA says any ambiguity has to be interpreted in favor of the non-movement. It's not ambiguity because it says we're going to – But even if you take that letter as clear on its face, I would point you to Dr. Ramachandran's testimony in 1886 and 1888. When asked, for example, about Whitney's input to the mentor, she didn't say we didn't agree to allow him to have any. She said he didn't respond to us. When asked about distributing learning styles, she just said, you know, this is what we did. She didn't say we never agreed to that. So I think that's enough to create a jury issue. But separate and apart from that, if you look at how they actually implemented the feedback, it goes directly into how Ramachandran skewed the process to generate a more negative clinical performance record. Am I right that it's after the accommodations that were given were put into place? It's after that that the problem arises with the infant surgery and the changing of the record on the wet tap? That those both happened after the accommodations? You're right about when those happened. I would note that we think there's a jury issue on Ramachandran setting him up to fail by starting him with the pediatrics rotation, which they agree is the most challenging specialty and that our expert testified is not a reasonable medical choice. Secondly, on the cleft palate surgery, again, there's a positive evaluation on that day. He had done two pediatric rotations in his first year, right? Yes. Yes, Your Honor, but he'd had six weeks out of the OR, and that's the point at which makes it unreasonable, because he didn't need it to graduate. Even the deputy testified to that. And so what our expert testified is it's not a reasonable medical choice to put him into that rotation to start this after six weeks out of the OR. I mean, is it still insane that he would do the same thing he had done in his first year, that we can infer from it that the hospital was intentionally discriminating against him? Well, it's one piece of the picture, and, yes, I think you can. I mean, we have an expert saying it's unreasonable, there's no reason for it, and the deputy is saying he didn't need it to graduate. Well, even if the pediatric rotation came early, it's the general anesthesia rotation that he fails in February of 2021, and that's where the wet tap incident occurred. And, Your Honor, I'd point you to the wet, first of all, again, not a reason for the termination, not even mentioned in the termination letter, but I'd also point you to the email where Henson talks about the wet tap, and he rates Whitney as middle of the group. He doesn't say he's one of the worst residents. But he's not supposed to change a record on his own. He's told that that's a fireable offense. Now, they don't fire him then, but it is a fireable offense what he did. And then he fails the basic exam for a third time, finishing at the bottom eighth percentile. This wasn't close. So this is all after the accommodations. I don't know how you can say that they can't be, that they haven't demonstrated that he's just not able to do this work, even with accommodations. So the wet tap incident, again, there's a fact dispute about what happened, but regardless of that, as Your Honor recognized, they didn't fire him for it. As a matter of fact, they deliberately gave him a written warning. So they can't now say that's the reason they're firing him for it, and it's not mentioned in the termination letter. No charting discrepancies or drug discrepancies are important enough. And guess who wrote the termination letter? Dr. Ramachandran. That was consistent with her influence over who the decision-makers were. So there's Ramachandran. But then, you know, the hearing panel said, numerous attending physicians in multiple and varying circumstances concluded that Dr. Whitney wasn't able to perform this core competency, that this inability led to multiple instances where patient safety was unacceptably compromised. The hearing panel said he had significantly more negative, poor or concerning evaluations than what would be expected for a resident at his level of CA3. And they reached that conclusion after two days of hearing and testimony from eight witnesses, and these are doctors, five different doctors, right, at the hospital. And you're saying Ramachandran was controlling that whole process? It's all just Ramachandran running, you know, this pretty elaborate process for terminating somebody from the residency program? So what I'd start with is the hearing panel is not decision-makers. The termination decision's already happened. They're exercising narrow, arbitrary, and capricious review. Second, they didn't get the whole story. As that recitation that you just gave mentioned, they're looking at evaluations. Those evaluations are skewed by a process designed by Dr. Ramachandran that was unique to Whitney and focused in on his deficits deliberately, gerrymandered to omit significant positive information and amplify negative information. I don't know if that's right, but even if an employer is focused on part of a record and not a whole record, it might still be that they're not discriminating, right? So you have to decide that the record was so skewed that but for the disability and Ramachandran's manipulation, the decision would have been different, right? So two responses on that, Your Honor. So one, I think here you may be right. A jury could find it was just like this weird process they created for Whitney and had nothing to do with his disability, but a jury could also find otherwise. This was a daily up-down vote on whether or not he's functioning as a third-year resident that no other third-year resident was subjected to. Everyone else got one evaluation at the end of four weeks, looking at his performance comprehensively over 25 years. Isn't there a system where they perform multiple evaluations, right? No, but they didn't. And they would have as many evaluations as they wanted, and that you'd have more evaluations when somebody was a particularly good performer or a particularly poor performer, right? So there is actually a specific thing where they talk about they can have as many end-of-rotation evaluations as they wanted, but in fact no one has ever remembered a time other than when Whitney when that happened. It's just not the way they operated. So the question is why did Dr. Ramachandran create this process that first focused evaluators in on ADHD-related characteristics and then asked them this up-down question on third-year resident that no one else was subjected to on a daily basis? What do you mean focused on ADHD-related characteristics? If the question is whether he can do the job despite the disability, you're going to focus on the characteristics to decide whether he's able to perform at the level at which he's not performing. Well, the standard, the hospital has a standard process to evaluate whether or not residents are meeting third-year resident standards. It's one end-of-rotation evaluation. I'm not saying there's not feedback that goes along the way, but there's one end-of-rotation evaluation, and it evaluates on 25. You can see an example of this at 21-16. It evaluates on 25 different characteristics, and it scores from 1 to 5. As attendings testified, that means you can make up for strong areas for weak areas, and you get a comprehensive assessment. That didn't happen for him. But as to your question about whether or not this record is skewed enough, I'd point to Dr. Ramachandran's own statements. After the initial termination recommendation, she was concerned about loopholes that might stop the termination from going forward, and this is even after she knew of the moonlighting, and so I direct you to the email at JA2052. If moonlighting is so certainly enough to fire and his record is so bad, how is she concerned about loopholes? Why is she worried about still proving her case? Why is she consistently, when there's positive evaluations, still losing feedback? Well, because the hospital is afraid of a lawsuit like this, right? And so they want to make sure that they're not going to be accused of discriminating on the basis of a disability. So there's a whole elaborate process for showing that they made an effort at accommodation and evaluating his performance in light of that. If, in fact, he raised the issue of his disability, and then the hospital turned around and said, well, the moonlighting by itself is dispositive, you'd be here still saying, well, that was discriminatory because they did that because they didn't want to make an effort at accommodating his disability, and it's obvious that that was opportunistic, right? So instead, they try to show his level of performance with the accommodations he requested, and you're saying, aha, that means they didn't really care about the other reasons. But, I mean, we're supposed to evaluate, you know, under the totality of what they did, whether it shows, whether there's an inference that they were discriminating intentionally because of his disability. Well, Your Honor, I think when they shape an evaluation process, again, this is not about giving him feedback. They even say this is a process designed to evaluate him, and they do it specifically for him and no one else. If they were concerned about... That's cool, right? They design a form for the supervisors to fill out that responds to the metrics that he wants help with, right? The time management and task prioritization and those kinds of things. He asked for feedback on those three things. They added other things. I turn you to JA 1985. It's an example of the form. They added other things to the form and then asked this up-down question. And as to failing his general rotation, it shows some confusion. Like, if you look at his general rotation, he actually got a number of positive evaluations. They discounted them all for one reason or another. It's part of this whole gerrymandering the performance record to amplify negative feedback and minimize positive feedback. All of those attendings that testified at the grievance hearing, a number of them, and I could give you examples, Chyfetz, Osborne, Piskulkov, had given positive evaluations the month before. And as Chyfetz testified... Okay, so why were they giving negative evaluations at the hearing? Because they had been manipulated by Ramachandran? I don't think it's... If they, in fact, had given positive evaluations previously, it shows they were not being manipulated by Ramachandran, right? I think what the record shows is that there's positive feedback, there's negative feedback, and the question is what makes it through to the ultimate decision-makers. And the record could show that Ramachandran then... I understand if you're saying that Ramachandran is in charge of what gets in front of the hearing, but you're telling me that actually people testified who had previously given him positive assessments and they only talked about negative things. Doesn't that mean that what they thought was most important in their minds was the poor performance? So of the people who testified, I mean, it's true, they certainly amplified the negative incidences, and they discussed, and this is Chyfetz at 388-89, that they'd been asked by Ramachandran to send e-mails after the fact. So Chyfetz, for example, gave two positive evaluations. Then he's asked by Ramachandran to send an e-mail. He sends an e-mail with a whole bunch of negative feedback, which was not... I understand, but how does the e-mail that he sent to Ramachandran lead to him at the actual hearing when he's testifying not talking about his positive experiences? Does she threaten him? No, I don't think that's the case. I mean, I think the fact that they had some positive feedback comes out at the hearing, but the hearing also considered the paper file, and the paper file omits significant positive information in two ways. One, as Whitney testified, there are attendings who had positive experiences with him who were not asked to provide evaluations, and two, even some positive evaluations just never got provided to the paper file, and there's the example of his OB pass and OB daily evaluations that don't get passed on to the ad hoc committee. So what we have here is an evaluation process that is structured also to generate more negative results with these unique Whitney-specific forms. Okay. Thank you very much, Ms. Hunt. You have reserved time for rebuttal, so we'll hear from you again, but let's turn to the appellee, Ms. High. Is that right, Ms. High? Hague, Your Honor. Hague. Sorry, I apologize. May it please the Court. Emily Hague with the law firm Littler Mendelsohn. I represent Montefiore Medical Center. As Your Honor's point out, Dr. Whitney cannot escape his performance issues. The legitimate non-discriminatory, non-retaliatory reason is profound in this case. Okay, but you have not moved for summary judgment on the fact that he could not perform the job without a reasonable accommodation, right? Right now the question, is that correct? Am I right about that? Your Honor, my only point to that is, in the moving brief, Montefiore did say, Montefiore did not have a duty to accommodate what plaintiff calls an ADHD-associated trait. Okay, and the district court assumed, arguendo, because you did not move for summary judgment, that he would have been qualified with a reasonable accommodation. Isn't that correct? Correct, the district court held that. Okay, so like our job might have been a lot easier if you had just said, even with an accommodation, this guy can't do the job. But you didn't. So right now, what we are trying to figure out is whether or not the district court applied the right standard. Do you agree that if there were direct evidence of discrimination, we would not be having a discussion about pretext and about McDonnell Douglas? Yes. Okay, and do you agree that the standard is not whether or not somebody had discriminatory animus, but whether or not the disability was the but-for cause of the termination? Correct, Your Honor. Okay, do you agree that the district court said, and I'm looking at page 14 and page 15, a whole bunch of stuff that is not consistent with the other things, that in order to prove summary judgment, you have to show animus, that you have to show a claim of discrimination must be examined under McDonnell Douglas? Are there questions of law that are problematic that we now have to revisit? There are no questions of law. Okay. What do I do about the fact that I can count just by looking on page 16 and 17 at least four references to the phrase animus, which you just said was not the legal standard? The district court said, felt so strongly about this case, he said, Dr. Whitney doesn't even get past the inference of discrimination to lead me to look at the non-discriminatory, non-retaliatory reason. He then, though, said, but Montefiore didn't focus on that argument, let's move on to the legitimate non-discriminatory reason. So the district court in his extensive decision, one of the longest decisions I've read, did say he doesn't even get to. That's not my question. My question is, did the district court look at the wrong standard by saying we needed to examine this under McDonnell Douglas, by saying that we have an animus and the animus needs to be proven? I mean, you could tell me it was just a, a shorthand or it wouldn't have mattered because there was all this other evidence. My question is, was the wrong legal standard used? No, Your Honor. You have to present some type of evidence to suggest an inference of discrimination. Sometimes that's presented through animus. Sometimes that's presented through other evidence. Well, an inference if you don't have direct, right? If you have direct evidence, nobody needs to go and find an inference anywhere. Is that correct? Correct. OK. So that's one question that I think, arguably, the district court mistook because it keeps talking about being examined under McDonnell Douglas under all circumstances. There's no clarification or nuance there. And then the second is suggesting that they needed to prove animus rather than but for causation. That the disability was the reason for the adverse action as opposed to did the decision maker have animus in their court? Is there any reason to think that the district court thought that the word animus meant something different from but for causation? That might be a better question. My understanding of the word animus is he's referring to an inference of discrimination or proof that the legitimate reason was not discriminatory. But that's the third and fourth test of the third and fourth steps. I think I'm good. Thank you. Your Honors, as you asked, were there legitimate reasons to terminate Whitney? The only reason we're here is Dr. Whitney believes there was a conspiracy against him from Ramachandran and Kim, stemming from 2018. His conspiracy theory doesn't explain his three standardized exam flunks. His conspiracy theory doesn't explain his sloppy medical records, including his 44% narcotic discrepancy rate. Number three, Dr. Whitney's conspiracy theory does not explain his three failed rotations. And the 28-plus doctors who provided written critical feedback were recorded by Dr. Whitney, giving critical feedback, testified in this matter or testified at the grievance. Number five, Dr. Whitney's conspiracy theory doesn't explain the moonlighting, which exemplifies his integrity issues, which were then showed during the accommodation period, where he changes the medical record. Number six, the conspiracy does not explain the fact that Ramachandran and Kim were not even the decision makers, ultimately. It went to the head of the department, Dr. Schaffran. Number seven, common sense, Your Honors. These doctors in the anesthesiology department wanted to graduate doctors. They wanted to graduate and move them on to anesthesiologists. Your Honors, the reason why Dr. Whitney is putting forth this conspiracy theory I think it would be discriminatory if the hospital decided, even if it's not true, like somebody with a diagnosis of ADHD just can't do the job and just was intent on firing him based on a kind of what opposing counsel calls a snap judgment. Maybe it's a stereotype. Maybe it's something like that. That could be discriminatory, right? No, Your Honor. It's not? No. If the performance issues that we're talking about today, which are extensive. Right. But that is the but. All right. You're saying that that's not true in this case because they documented the performance issues. But if, in fact, it were true that they just made a judgment based on his ADHD diagnosis that he ifso facto can't do the job and they went ahead and fired him for that reason, that might be a problem. So 2018, Ramachandran identified, this guy has an issue with organization. He freezes in the OR. Let me just say. I'm not asking about this particular case. Just in the abstract hypothetical, that is not this case. If there were a different case where somebody just said, I have this diagnosis. And then the hospital responded by, well, you just can't do the job because of that. So we're firing you. Correct, Your Honor. That would be a problem. Correct, Your Honor. That doesn't describe this case because, in fact, they tried to sort out his performance issues from his disability. Correct, for three years. And, Your Honor, it doesn't matter. And you brought this up, Your Honor. Whether the cause of his deficiencies is his ADHD, which is still unclear as to what Dr. Whitney is alleging here, or they're unrelated to his ADHD and he just simply has these performance issues, or number three, his moonlighting was so distracting because he was earning a million dollars outside the hospital that he was having these performance issues. Well, it has to be that he has to. It's not just that he can't do it because of the disability. It has to be he can't do it with the disability plus reasonable accommodations, right? Because there's an obligation to provide reasonable accommodations. Yes. He cannot do the job with or without accommodation. Okay. And so what about the moonlighting question? So it's true they raised the moonlighting, but then they suspend the termination and give him a chance to show performance with accommodations. If the moonlighting was so important, maybe they should have just fired him then, even after they learned about the ADHD. Why doesn't that show that the moonlighting actually wasn't that important? Number one, the moonlighting is one of seven reasons. Okay. But you're saying, but I think, are you conceding that he would not have been fired alone for the moonlighting? Yeah. So 2020, they let him continue. 2021, they still referenced moonlighting. Why? Because it questioned the integrity issues that then popped up during the accommodation period when he changed the record. So not only performance in the OR, testing, he also had integrity and lying issues. Okay. Why didn't you guys move for summary judgment on whether or not he was qualified to perform the essential functions of the job, with or without a reasonable accommodation? Well, Your Honor, I wrote that brief, and pages 28 to 29 of the moving brief, I thought made that argument. The moving brief states, quote, at no time did Montreux agree to permit plaintiff to practice medicine with these traits as an accommodation. In other words, if his disability is the reason he is not performing, then Montreux has no obligation because he cannot satisfy ever the essential functions of the job. His disability makes it impossible. If he's saying his disability is the reason he is not performing, which was unclear at that time, but we don't, Your Honors, even if I concede we didn't make that argument, and Judge Engelmeyer loved that argument, we then move to the legitimate non-discriminatory reason, which is undisputed. He assumes that arguendo. I don't know how you can argue that he loved it. Well, he made it for us in a more robust fashion,  Your Honor, moving on to the failure to accommodate claim. Well, your answer is just about the reasons that existed that don't seem to be affected by the accommodation period. I guess your answer is we have a whole set of reasons for terminating him. When he raises the ADHD, we're going to allow him to spend three months showing whether or not he could perform with accommodation, but then at the end of that process, we haven't waived the other reasons. We're just going to look at the whole basket of reasons again to see if they justify a termination decision. Yes, Your Honor. And in fact, it is true the hearing panel does say violated the moonlighting policy by working outside the residency program. Yes, Your Honor. Perhaps I'm wrong, but I have thought the district court, your argument was that the moonlighting policy or the moonlighting, despite a policy against it, suggests that the plaintiff was not in good faith trying to take advantage of the accommodations you gave him. Did I misunderstand that? I think that is a relevant point. Because, you know, he obviously needs assistance with an attention deficit disorder, and yet he's moonlighting, which might affect anybody's attention because of being tired from trying to work two jobs at once. Is that the gist of the argument on that subject? That is a gist of the argument. Okay. Your Honor, moving on to the failure to accommodate claim, which the district court also dismissed, and we ask that you affirm that. The district court, Dr. Whitney first says, well, the district court got the law wrong. I think by reply, they concede that he got the law right. The obligation for the employer is to provide a reasonable accommodation that permits the employee to do the job. He doesn't always have to get it perfect every single day. He does not have to give Dr. Whitney everything on his list. And the record evidence, which is extensive, shows that they gave reasonable accommodations so he could perform the job. The best evidence in this case is Dr. Whitney's recordings. 75 recordings he took in secret during the accommodation period, and it shows nonstop performance feedback that was extensive, detailed, critical, not begrudging or belittling. Never once was a discriminatory comment made, and it stands in the face of his now claim that he wasn't given feedback or that it was begrudging. He also raised for the first time that he didn't get protected breaks. There is record evidence of Dr. Whitney testifying that he got all the breaks he needed, and generally he doesn't need breaks. He testified that in his deposition. Also... Why is that a fact question? I mean, he does say that that's one of the accommodations he wants is the breaks, and the hospital does say, we're going to honor your request to have the breaks, and then he says that he didn't get the breaks. I mean, is that not a fact dispute as to whether he was accommodated? Your Honor, his attorney argues that on appeal. In deposition, he said he got all the breaks he needed. And ultimately, he doesn't point to any accommodation that he could have gotten more of an accommodation that would let him perform the job. His performance continued to suffer. He failed the exam a third time, and all of the other issues we raised. The number of doctors here also involved, the 28-plus doctors, makes a Katzpah theory impossible. And the only reason the Katzpah theory is being put forth is in 2020, when Monfior said, you're done if nobody knew about his ADHD, there can be no discrimination. He has to say that it goes back to 2018 to show all my performance issues are not real, fake, pretextual. But there's no evidence of that. And the district court did not agree with them that anybody lied in this case. The district court said, in arguendo, let's just play with this theory, even though there's no text about ADHD, there's no email about ADHD. There's an email in 2018, right? There's one email in 2018, after he was talked about, about this not being the right specialty for him, where he mentioned always having ADHD in his life and succeeding because of it. One sentence that Ramachandran and Kim both testified credibly, that that did not register anywhere in their brains. But he wants you to believe that for three years they secretly plotted and convinced all of their colleagues, 28-plus doctors, to criticize and document his performance issues when, in fact, his performance was fine. No reasonable jury would believe that, Your Honors. I ask that you affirm the district court and that you affirm all the doctors at Monfior that documented his performance and testified under oath that he should not be an anesthesiologist. Thank you very much. Ms. Haig will turn back to Ms. Hunt on her own. So, Your Honor, I think it's conceded and clear that the ability to do essential functions is forfeit on this record. Secondly, as to these other reasons for termination, it's a jury question. And for the drug discrepancies, of which, again, there was a later audit of 8% that was concealed from the hearing panel, for the charting errors, and for the basic exam, none of those are listed as reasons for termination. But, you know, when I said, you know, the hearing panel, there are all these doctors testifying and making the decision. How could you say Ramachandran is manipulating it? You said, well, the hearing panel was just reviewing an earlier decision, so maybe she didn't control them, but they were not independent. And now you're saying, well, there's evidence that came out between the initial decision and the hearing panel, and that would have made a difference. But if the hearing panel is just reviewing the earlier decision on that record, then it wouldn't really matter that there was a new audit. Well, I think it does matter because they added in their review additional reasons that the court has been mentioning. The wet tap, which is not mentioned in the termination letter that Ramachandran wrote, and the drug discrepancy. Again, that's something that the hospital didn't think was important to list as a reason for termination. Or they don't want to get sued over it, right? The hearing panel added it, and Ramachandran did not, she concealed from the hearing that there had been a second audit that showed an 8% drug discrepancy. On moonlighting, I direct you to JA 2058, where Ramachandran writes, after the initial termination, she's worried about loopholes. I was hoping that there will be some institutional guidelines for this type of moonlighting, but it looks like there are no repercussions from the institution standpoint. A reasonable jury could find that's not a fireable offense at the hospital, notwithstanding that's a policy violation, especially given that they set it aside. She's complaining about that, right? She's saying that the hospital is acting unreasonably but not enforcing its own, or I expect it to act unreasonably but not enforcing its own guidelines. If it turns out that it does care about it, then that is a happier result than I otherwise expected. Right. She was hoping there would be some institutional guidelines, but there are no repercussions from the institution standpoint. That sounds like she went and inquired about policies, and they didn't exist to her satisfaction. Obviously, there is a moonlighting policy, but not such something that says it's a fireable offense. She was worried about that, so a reasonable jury could find it's not. Secondly, on the clinical performance, again, the jury could find it's not the whole story. I think what's missing here is the idea that these evaluations, and this goes to the accommodation claim as well, whether or not they agreed to provide feedback in a certain way in a supportive environment where they distributed it as learning style, the way they actually instituted it made things harder for Whitney, not worse, by this unique, specific-to-him process that juxtaposed the traits they were concerned about with this evaluation. And I think if you're looking for direct evidence of disability, and of course we agree, and this is Porter, you don't have to get to pretext if it exists, I think that actually is direct evidence. And so that skewed the record in addition to all the gerrymandering of amplifying negative feedback and leaving positive feedback out. And last, on the breaks, I would point the court to the testimony at JA 1954 to 1955. Whitney did say, I typically don't require much break, but then he said, the most important thing is, for Lunt especially, they kept incorporating the next case into the break. So he was responsible for making sure the patient was delayed, he had to work through the break in order to get his work done. That's just one out-of-comprehensive picture of accommodations that they didn't provide. And so for both of those reasons, we think the district court should be reversed. Thank you very much. Ms. Hunt, the case is submitted.